UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SETH CURKIN, PARASTOU MARASHI, P. JENNY MARASHI | Case No.: 1:18-cv-7541 |
| Plaintiffs, | |
| vs. | **FIRST AMENDED COMPLAINT** |
| THE CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT ("NYPD") DETECTIVE ROBERT GRAVES, DETECTIVE MATTHEW MURPHY, SERGEANT SONIA CHRISTIAN, | DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiffs, by and through their undersigned attorney, allege as follows:

## NATURE OF THE ACTION

1.   Plaintiffs brings this action for compensatory damages, punitive damages, and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violation of their civil rights under 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendment to the United States Constitution.

## JURISDICTION

-1-

2.   The Court has jurisdiction over Plaintiffs' federal law claims under 28 U.S.C §§ 1331, 1343(a), (3), and (4).

## JURY TRIAL DEMANDED

3.   Plaintiffs demand trial by jury of all issues properly triable thereby

## VENUE

4.   Venue is proper for the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) and (c).

## THE PARTIES

5.    Plaintiffs Parastou Marashi, P. Jenny Marashi, and Seth Curkin are United States citizens and residents of the City and State of New York.

6.    That at all times herein mentioned, Defendant CITY OF NEW YORK (hereinafter "CITY") was and is a municipal corporation, duly organized and existing under and by virtue of the laws of the State of New York.

7.    That at all times herein mentioned, Defendant CITY operated, controlled and maintained a police force known as the New York Police Department ("hereinafter "NYPD").

8.    That at all times herein mentioned, defendant Detective Robert Graves (hereinafter, "GRAVES") was and is an NYPD officer employed by defendant CITY.

9.    That at all times herein mentioned, Defendant GRAVES was acting within the course and scope of his employment with defendant CITY.

10.    That at all times herein mentioned, Defendant GRAVES was acting under color of state law.

11.    Defendant GRAVES is sued herein in both his individual and official capacities.

-2-

12.      That at all times herein mentioned, defendant Officer MATTHEW MURPHY (hereinafter, "MURPHY") was and is an NYPD officer employed by defendant CITY.

13.      That at all times herein mentioned, Defendant MURPHY was acting within the course and scope of his employment with defendant CITY.

14.      That at all times herein mentioned, Defendant MURPHY was acting under color of state law.

15.      Defendant MURPHY is sued herein in both his individual and official capacities.

16.      That at all times herein mentioned, defendant Sergeant Sonia CHRISTIAN (hereinafter, "CHRISTIAN") was and is an NYPD Supervising officer employed by defendant CITY.

17.      That at all times herein mentioned, Defendant CHRISTIAN was acting within the course and scope of her employment as a Supervisor with defendant CITY.

18.      That at all times herein mentioned, Defendant CHRISTIAN was acting under color of state law.

19.      Defendant CHRISTIAN is sued herein in both her individual and official capacities.

20.      At all relevant times herein, the individual Defendants acted jointly and in concert with each other.

21.      Each individual defendant had the duty and the opportunity to protect plaintiff from the unlawful actions of the other individual Defendants, but each individual defendant failed and refused to perform such duty, thereby proximately causing Plaintiffs' injuries.

## **STATEMENT OF FACTS**

22.      On August 18, 2015, Seth Curkin was working as a full time attorney at the Legal Aid Society's criminal defense division in the Bronx.

23.      On August 18, 2015 Parastou Marashi was working as a UX designer as an independent contractor and for Bloomberg.

24.      On August 18, 2015, P. Jenny Marashi, Esq. was working as a solo practitioner civil rights attorney specializing in police misconduct cases.  At that time, she was representing about a dozen plaintiffs in suits filed against NYPD officers in state and federal court.

25.      Seth Curkin and P. Jenny Marashi have been married and living together at 7 East 14th St. #820, since 2009.

26.      Before that Seth Curkin bought and solely resided in his home from 2004.

27.      On August 18, 2015 Parastou Marashi was living in Astoria, Queens.

28.      On August 18, 2015 the official and permanent office address for P. Jenny Marashi's solo law practice , on all her court files, was her shared residence with Mr. Curkin, the above mentioned 7 East 14th St. #820, NY, NY 10003.

29.      On August 17, 2015 Seth Curkin and P. Jenny Marashi and their two children left their residence at 7 East 14th St, and went on vacation to California.

30.      Parastou Marashi is P. Jenny Marashi's younger (by 5.5 years) sister.

31.      P. Jenny Marashi gave the keys of her apartment/office to her sister so she could check the mail, feed the fish, water the plants, or whatever other use she deemed fit.

32.      On August 17th, at approximately 9 P.M. Parastou Marashi went to a Yoga class close to 7 East 14th Street.

-4-

33.     After class, she went to the Curkin home/office, sent a message to let the Curkin's know and decided to stay there.

34.     On August 18, 2018, at approximately 3:00 A.M. Pacific Standard Time, P. Jenny Marashi received a call from her sister's cellphone.

35.     When she picked it up she was surprised to hear NYPD Police Officers stating they were in her home, that they had come on a warrant for some unspecified person, and that they had called the ambulance because her sister had fainted twice.

36.     P. Jenny Marashi, was in disbelief that the two NYPD officers from the warrant squad were in her home/office, the day after she left for vacation.  When she asked the NYPD Officers for whom they had come, and what they were doing at her home/office, who they were, she did not receive any response.

37.     When P. Jenny Marashi spoke to her sister on the phone, while the NYPD Officers were at her house, her sister told her the following had transpired:

38.     Parastou Marashi was asleep, when at approximately 5:30 A.M. EST she hears a loud banging on the door.

39.     She goes to the door, and is told that it is the NYPD warrant squad.

40.     She opens the door and sees, two officers who say they have an arrest warrant for, T****s H*****r, some person she does not know, and they then proceed to enter the apartment. Once officers are inside the apartment,  Parastou Marashi, worried and uncertain about why they have come, asks them if she can see the warrant for the person, since she has never heard of such a person and that he definitely does not live there.

41.     Officers respond by saying they have a warrant for such, T****s H*****r, a person at this address.

-5-

42.     Parastou Marashi then asks to see the warrant, and offers to take a picture of the warrant to send to her sister and brother in law.

43.     As Parastou Marashi is pulling out her camera to take a picture of the papers that are in Officers' hands, the Officers ask her what her sister does for a living, and what her brother in law does for a living.

44.     When she hears the Officers asking her these questions she worries that perhaps they came to intimidate her or her family, and she gets so scared, that she faints.

45.     She wakes up from fainting and, again, is questioned about her family by the Officers.  She again is so frightened that she faints.

46.     The NYPD Defendant Detectives, who created the exigent circumstance, knowing that people faint and get scared when woken up at 5:30, continued to walk further into the residence and put Parastou Marashi on the couch and get her some water/juice from the fridge.

47.     The NYPD Officers then called the ambulance to come to make sure that Ms. Parastou Marashi does not need any further medical attention, for a situation that the Officers themselves created by illegally entering the home, lying that there was a warrant for someone completely unconnected to the home, asking questions about a person who has no connection to the home, hiding the warrant, and asking Parastou Marashi about the work of her family, which is often directly adverse to illegal actions taken by Officers.

48.     As they are waiting for the ambulance, Parastou Marashi asks Officers what their names are.  Officers tell her that they will leave their cards at the front desk with the doormen of the building.

-6-

49.     According to Les, the Doorman who was working the shift when officers entered and left the building, Officer never identified themselves, and did not leave a card with him.

50.     In fact, according to Les the night shift doorman, the Officers entered the building saying they were there for some person, , T****s H*****r, who did not live there.

51.     According to Les, he told the Officers that he does not know such person, T****s H*****r, and that this person does not live in the building.

52.     According to Les, when he informed Officers that, T****s H*****r,  such a named person does not live in the building, Officers asked him which apartment was owned by Seth Curkin.

53.     Les then told Officers that apartment #820 was owned by Seth Curkin.  Officers then told Les not to call up, and that they would be going up to the apartment.

54.     The NYPD Officer's entry and ride up in the elevator and down the elevator and out of the building was all caught on video.  Never did the NYPD officers ever give their card to any doorman, or ever identify themselves.

55.     P. Jenny Marashi woke Seth Curkin to tell him the police had come to their home.

56.     Seth Curkin and P. Jenny Marashi were shocked and alarmed that Officers had come to their home, and rather than identify themselves, and explain why they had come and how it was a misunderstanding or a mistake, consistently refused to give their name and also did not show the warrant, or explain the reasoning behind their invasion.

57.     Had Defendant Officers tried to explain, or speak to, or explain, the reason they had for coming, it would have saved Plaintiffs from much fear and doubt.

58.     For several days the Curkin's and Marashi's are alarmed and very stressed, but, tell themselves that there is no way NYPD Officers came to their apartment to intimidate or harass them.

59.     Upon returning to NYC, Plaintiffs decided that they should go to the CCRB so that the CCRB can investigate the purpose of the warrant, and the names of the Officers. CCRB notifies Plaintiffs that it does not have jurisdiction to find the purpose.

60.     After one year, and much back and forth, Plaintiff's decide to go to the Internal Affairs Bureau (IAB), so at least there, they can finally settle why the Officers came to their home, and who they were.

61.     On September 16, 2016 Plaintiffs filed a complaint with the IAB.

62.     The IAB took their information, Plaintiffs provided to the IAB all names and numbers and videos showing the NYPD officers entering and leaving the building.

63.     On December 6, 2017 Plaintiff P. Jenny Marashi spoke to Defendant Sergeant CHRISTIAN, the IAB officer conducting the investigation, who informed Plaintiff that she cannot find any record of a warrant linked to 7 East 14th St #820, her home/office.

64.     Almost two years after the filing of the case with the IAB, the file being sent to the wrong precinct, and after many phone calls from Plaintiffs trying to follow up on the results of the investigation, Defendant Sergeant CHRISTIAN called Plaintiff P. Jenny Marashi on July 2, 2018, to inform Plaintiffs of the following:

65.     The names of the Officers who came to Plaintiffs' home/office, are Defendants NYPD Detective Matthew Murphy and  Detective Robert Graves.

-8-

66.     That Defendant Officers when interviewed said they had obtained the address because some person, a "John Walden" had made a call from jail to a number linked to the address.

67.     Plaintiffs have never heard of, nor did they ever knowingly speak to a "John Walden", not in person, or from jail.

68.     Defendants GRAVES and MURPHY had in fact themselves together, or jointly with John Does maliciously used process in the form of an outdated  bench warrant for T****s H*****r, to gain entry into Plaintiffs' home, and that some time after the date of the incident, or after the date of the IAB investigation filing on September 16, 2016, Defendants GRAVES, MURPHY, AND CHRISTIAN  had conspired with each other, and John Does,  to create/fabricate new paperwork in contradiction to the warrant they had originally used, and knew indicated that there was no probable cause to enter the apartment, and that such action was taken for their own personal gain, among those reasons, for retaliation of Plaintiffs' first amendment activities of describing police misconduct, and not for any official NYPD purpose.

69.     And that after September 16, 2016, and Plaintiffs' filing of the IAB report, Defendants then tried to hide their unlawful use of the warrant for T****s H*****r, they had used to gain unlawful entry into Plaintiffs' home, and then conspired with each other, creating a false story and supporting documents alleging that they had come for a novel reason- despite it being in contradiction to what they originally told Plaintiffs and the doorman.  They then created DD-5's and other documents to support the new story they had created to cover-up their illegal conduct, creating false paperwork, hiding contrary documents

in order to cover up their use of the invalid warrant, for this T****s H*****r, that they had used to illegally enter in Plaintiffs' home.

70.     Defendant CHRISTIAN, who was assigned to investigate the case by the IAB, did not investigate the case because she agreed to assist in the cover up Defendant's unconstitutional actions.  She assisted Defendants MURPHY and GRAVES in the supplying of false documents to create a false paper trail to cover up the unconstitutional actions of Defendants.  She further conspired with Murphy and Graves, by not taking any steps to actually investigate the August 2015 entry, and also by actively blocking any access to and information about the case and inquiries from Plaintiffs. This was all done for her personal gain and/or for her dislike of civil rights attorneys and criminal defense attorneys who had sued her personally before, or interfered with her unlawful actions, or for some other personal motive that was no in furtherance of official NYPD policy.

71.     Defendant CHRISTIAN assisted and conspired with GRAVES and MURPHY in their personal motives, that are not NYPD official business.  Those personal motives include but are not limited to dislike of civil rights and criminal defense attorneys, the illegal entry into plaintiffs' home for non-NYPD official business, the illegal entry into plaintiffs' home gain access and remove something from the home, and/or in an attempt to intimidate and harass Plaintiffs in an effort to get them to stop taking action and speaking out about police abuse and misconduct.

72.     Defendant CHRISTIAN, aware of significant red flags, consciously chose to ignore them, and reinstated GRAVES and MURPHY rather than discipline them or order additional investigation.

73.      The CITY Defendants through CHRISTIAN and GRAVES and MURPHY then purposely sat on the results of the "investigation" from January 2018, when the last action was taken on it, until six months later, July 2, 2019, in an effort to hide discovery of the documents so that Plaintiffs could not take legal action, all in an effort to cover up violations, so that Plaintiffs would not be able to take any legal action against them.

74.      Defendant Officers GRAVES, MURPHY, and CHRISTIAN, herself a former warrant detective, know that they needed a link to Plaintiffs' apartment since the entry with a warrant that was not for the apartment, and was falsely used as justification for such entry, was a constitutional violation of huge importance.

75.      Defendant Officers did not have any justification or paper trail for why they had come to the apartment, so they conspired together and made up that some person they were investigating during August of 2015 called from jail to the main Legal Aid number, and that was their link.  This despite the fact that the main Legal Aid number is not a number linked to Plaintiffs' home address.  Furthermore, that the TLO search records documents never provided for such link.

76.      Furthermore, despite Plaintiffs' accounts of what transpired, Defendant CHRISTIAN purposely chose to ignore the evidence, choosing instead to assist in the cover up a constitutional violation, actively participating in it, not remedying it, covering up any violation, acting with gross negligence, and not taking action (in a lawful manner) on information that an illegal entry had taken place.

77.      Defendants actions were done not in pursuit of any interests of the NYPD, but rather, in order to cover-up the unconstitutional actions of Defendants.

-11-

78.     Defendant Officers GRAVES, MURPHY, and CHRISTIAN, herself a former warrant detective, know that a call from jail to a number would be a sufficient link to a home that would allow the alleged use of an I-card.  That is why they created the link, as an excuse that did not require any paper trail and provide for a cover up of the initial illegal entry. Defendants know that they do not need an I-card to knock on doors, and they conspired with each other to create a story that would shield them from discipline and from scrutiny, and liability.  The cover up was, as it tends to be, worse than the crime and led to the further constitutional violations involving denial of access to courts, and abuse of process, etc. employed by defendants- and causing further injury to plaintiffs who have now had to spend much time uncovering these unconstitutional actions of Defendants.

79.     Never the less, knowing a call from jail to a number is not probable cause that a person resides at a home, Defendant Officers GRAVES and MURPHY came to Plaintiffs' home illegally and under made up pretenses, and Sergeant CHRISTIAN assisted Graves and Murphy in the cover up of their actions, leading to further constitutional violations.

80.     Furthermore, Defendant CHRISTIAN informed Plaintiffs that Defendant Officers GRAVES and MURPHY stated that they had given their cards to the doorman. This, despite the fact that there is video footage of the entire interaction of Officers with the doorman, and that the doorman himself said he never received their cards.

81.     Defendant CHRISTIAN informed Plaintiffs that their claim that Defendant Officers GRAVES and MURPHY did not identify themselves, based on the above statement of officers saying they did give their card to the doorman, has made the IAB rule the claim as unsubstantiated.  Which, Defendant CHRISTIAN went on to explain, does not mean that it is not true.

82.     Plaintiffs reminded Defendant CHRISTIAN  that there was video of the entire interaction in the lobby with the doorman, and there was no giving of a card on the video. Plaintiffs also reminded Defendant CHRISTIAN that they had provided the doorman's number and full name for them to contact.  Why, then, was the allegation unsubstantiated, Plaintiffs asked.  No response was provided except that the Defendant Officers GRAVES and MURPHY said they gave their cards to doorman.

83.     Finally, Officers came to the residence/office without a warrant, in knowing violation of the constitution.  The IAB conducted an investigation that revealed, according to the December 6, 2017 statements made, there was no warrant to come to the residence. However, to the best of Plaintiffs' knowledge there was no disciplinary action taken against Defendant Officers GRAVES or MURPHY, nor was there any manner of acknowledgement or apology issued.  There was only the above mentioned statement that the allegations that Defendant Officers GRAVES and MURPHY did not identify themselves were found to be unsubstantiated.

84.     The NYPD has a practice and policy of not disclosing disciplinary action of its officers, and using the debated and antiquated assault to democracy which is Section 50-a of the New York civil rights code.

85.     Rather than holding NYPD officers accountable for their actions to themselves, and to the public, Officers are shielded from liability and transparency.

86.     Defendant CHRISTIAN who knew of the illegal activities of NYPD Officers who made an illegal entry into Plaintiffs' home, did not, upon information and belief, take any disciplinary action against Officers.

87.     On August 18, 2018 Plaintiffs filed this complaint in the SDNY, where this case fell under Local Rule 83.10, "The Plan"

88.     As a part of Plan discovery, the City provides to Plaintiffs certain "Initial Disclosures".

89.     Defendant City's Initial Disclosures files show that unbeknownst to P. Jenny Marashi until the Initial Disclosures, the CCRB was able to find and produce the 2012 warrant for T****s H****r., that was maliciously used by GRAVES and MURPHY to violate Plaintiffs constitutional rights, and then was hidden in the IAB investigation files by Defendants in violating their First, Fourth, Fourteenth Amendment rights.

90.     This warrant, with the name "T****s H****r was the name that Plaintiffs provided to Sergeant Christian- telling her that Defendants Graves and Murphy had stated to Parastou Marashi, and to the doorman, that they were there on that warrant. Sergeant Christian hid any mention of such name in any of her paperwork, in an effort to cover up the unconstitutional actions of GRAVES and MURPHY.

91.      GRAVES, MURPHY, and/or CHRISTIAN fabricated this new I-card story, with this a non existent and not investigated so called "match" to Plaintiffs' address in the DD-5s to cover up, and provide a benign explanation, for their entry even though they knew that the explanation was false, deceptive, and made for the purpose to conceal their nefarious conduct.

92.     The City of New York's IAB are, as makers and supervisors of the NYPD policy and customs towards improper entries, liable for the constitutional violations against Plaintiffs.

-14-

93.     Policymakers have long had constructive knowledge of the custom and practice

of police officers and the City of New York abusing improper entries and IAB investigations,

but have failed to do anything about this disturbing pattern.

94.     Nearly four years ago, the CCRB published a study conducted over a 5-year

period which emphasized that it "received between 535 and 622 complaints per year of

improper entries, searches, and failures to show a warrant."

95.     A variety of annual reports from the NYC Commission to Combat Police

Corruption highlight long-standing problems in IAB investigations.[1]

---

[1] For example, in 2006, the Commission noted that IAB investigations could be strengthened by investigators ensuring they explore all significant evidentiary leads before closing a case. It also noted that investigators could have better pursued leads that were developed during an investigation, and that "further examination of these leads would have been beneficial in that they may have revealed pertinent information, strengthened the eventual disposition, or led investigators in a different direction." Perhaps tellingly, the Commission "rarely found evidence of any discussion between investigators and their teams concerning whether a particular lead was likely to produce evidence and, therefore, whether its pursuit was a constructive use of Department resources. In 2008, the Commission observed that in a few cases, when questioning officers about information, "the interviewers would accept [their] answers without challenging [them.]" In other investigations, "interviewers failed to question a subject about information that may have cast doubt on the officer's version of events." The Commission also recommended that "when questioning an officer, investigators confront him with any evidence that tends to disprove the officer's version of events, even if this evidence is external, because forcing the subject officer to state the response for the record may highlight situations where the subject officer's response will not be the assumed one." In 2012, the Commission encouraged investigators to conduct canvasses for video cameras in the immediate aftermath of receiving an allegation so that video footage of the incident can be secured. In three cases in 2013, "IAB did not interview witnesses who might have provided relevant information, despite the fact that the investigating officers had the contact information for those witnesses in their files." The Commission also noted that "witnesses should have been interviewed since on its face they appeared to have relevant information that addressed the crux of the allegations. Better practice would be to interview witnesses who might provide relevant information." In its 2014 report, the Commission noted that "IAB failed to interview some witnesses who might have possessed relevant information and easily could have been contacted by the investigator."  In 2014, the Commission concluded that in nine cases, "some of the interviews could have been more effective. In these cases, the investigating officer failed to address specific allegations, failed to ask appropriate follow-up questions seeking more detail, failed to use available contradictory evidence to challenge the statements of the subject officers, or failed to provide witnesses with the opportunity to view photograph arrays when appropriate." In 2017, "the Commission found a greater number of issues in the investigations it reviewed in 2015 and the first eight months of 2016, than in 2013 and 2014. The areas that the Commission believed were most susceptible to improvement were the dispositions assigned to allegations in the cases, the interviews of available witnesses, the quality of the investigators' interviews, and the team leader reviews." In 2017, "the substantiation rate for the most serious allegations of the cases reviewed increased significantly from 15% in 2014 to 24% for this reporting period." In 2014, United States District Judge Arthur Spatt emphasized in his ruling on Slack v. County of Suffolk that "the jury could have reasonably discredited as unreliable the finding of the Internal Affairs Bureau (IAB) that the officer had probable cause to arrest plaintiff, as IAB never interviewed the officer, witnesses testified that plaintiff never interfered with the officer's arrest of another person,

96.     On June 4, 2019, U.S. District Judge Raymond Dearie noted a direct correlation between unsubstantiated allegations and subpar investigations: "It is hard to appreciate how the City considers itself blameless given the impressive history of complaints …and the 'uninterested and superficial' investigations that followed." Judge Dearie states: "The investigations in these cases, fairly characterized, were at best modest and no genuine fact-finding occurred. …. The record further reveals that investigators routinely forgo any classic fact finding, even when there is clear corroborating evidence, preferring instead to affix the unsubstantiated label once the accused officer denies the conduct in question. The clear, unmistakable impression is that if there is no irrefutable corroborating evidence, the matter is conveniently labeled "unsubstantiated," which, as a practical matter, the City equates with exonerated. Apparently, unless an officer is caught red-handed or his conduct is undeniable for whatever reason, the NYPD and the City simply choose to regard the allegation as a non-event having no factual or legal evidentiary significance in terms of supervisory responsibility or legal analysis, no matter the frequency or similarities in the complaints."

97.     The June 4, 2019 Order highlights numerous serious pitfalls in IAB investigations, including but not limited to: "Investigators systematically refuse to credit testimony by civilian witnesses with regards to use of force yet routinely credit uncorroborated statements by the officers. Investigators decline to substantiate allegations, even when they find them to be plausible, whenever the officers deny the offending conduct; Investigators reach conclusions that defy common sense and do not logically flow from the investigation's factual record; The depth of investigation conducted does not match the

---

and the officer gave three different accounts as to how plaintiff interfered with that arrest, including the account he gave to IAB."

gravity of the allegations; Investigators do not consider the officer's complaint history to identify patterns in the officer's behavior; No real, thorough investigation is conducted given that investigators rely on what the subject officer's supervisor relays about the incident; Most complaints are referred to another department for further investigation, but IAB receives no information about how, or whether, those departments conduct investigations and the results of the investigations; Pertinent information from an investigation is not shared with other departments conducting additional investigation."

98.     Dearie further emphasizes that "The City cannot be heard to complain about notice when it allows a demonstrably flawed system to persist while it sticks its head in the sand and pleads innocent ignorance."

99.     City Defendant has long had constructive knowledge of this problematic custom and practice of improper entries and subpar IAB investigations, and failed to act in a way that would prevent further violations of constitutional rights.

100.     The City of New York is liable for these underlying constitutional violations committed by GRAVES,  MURPHY, and CHRISTIAN because the city's policy is objectively deliberately indifferent to the likelihood that a constitutional violation would occur.

101.     Second, a pattern of constitutional violations regarding improper entries and subpar IAB investigations by police officers has become apparent, and no discernible training, supervision, or discipline has been put in place to fix this problem, thus making the city liable.

102.     Reports from the NYC Commission to Combat Police Corruption highlight long-standing need to utilize thorough IAB investigations as grounds for training,

supervising, and disciplining officers. In 2004, the Commission emphasized that "it is important to conduct thorough investigations into allegations of corruption or misconduct so those officers can be disciplined and, when appropriate, even terminated, and so that other officers will see that the NYPD will not tolerate misconduct from its members."

103.     In 2006, the Commission underlined that "officers who demonstrate behavior problems, fail to complete their assigned duties, or who commit acts of misconduct, require individualized attention so that attempts can be made to improve their performance, or have their employment terminated."

104.     In 2014, the Commission found five cases where "the officers' failure to investigate potential criminal misconduct was so serious -- either due to the nature of the crime alleged or the vulnerability of the victim -- that higher penalties were deserved. The Commission recommends that in situations where a member of the service abdicates his police responsibilities, and puts the victim at risk of further harm and/or jeopardizes the apprehension and criminal prosecution of the perpetrator, the Department include dismissal probation as part of the penalty."

105.     There is an obvious need to train and supervise police officers on the specific constitutional limits regarding improper entries and IAB investigations, and discipline them if either violates any constitutional rights. The city is liable because despite this obvious need to train, supervise and discipline, it was deliberately indifferent not to do so.

106.     Sergeant Christian, knew of the illegal activities of NYPD Officers GRAVES and MURPHY who made an illegal entry into Plaintiffs' home, did not, upon information and belief, take any disciplinary action against Defendants, in fact, they covered it up by not reporting the results of Investigation, and avoiding Plaintiffs' biweekly calls.

107.     Plaintiffs suffered damage as a result of the defendant's actions.  Plaintiffs were deprived of their liberty, suffered emotional distress, mental anguish, fear, pain, and anxiety, and have had to spend countless hours pursuing their violations.

108.     All Defendants agreed, cooperated, participated, and conspired with their co-Defendants herein to assist in and effectuate Plaintiffs' unlawful entry, and malicious abuse of process for an entry that Officers knew that they did not have probable cause to effectuate, and in so doing deprived Plaintiffs of their rights, privileges and immunities secured by the Constitution of the United States, including, but not limited to, their rights under the Fourth Amendment to the U.S. Constitution to be free from unreasonable searches and seizures and to due process of law, and the substantive due process provision of the Fourteenth Amendment.

109.     Defendants engaged in the above-described conduct intentionally and/or with deliberate indifference to Plaintiffs' constitutional and civil rights.

110.     All Defendants acted in concert to harass and intimidate Plaintiffs and initiate a search against them that there was no probable cause to obtain.

111.     Defendants GRAVES and MURPHY illegally entered Plaintiffs' home despite knowing that there was no legal justification for doing so in order to justify their own actions, Sergeant CHRISTIAN participated directly in, and failed to intervene against the conspiracy to cover it up.

112.     Defendants GRAVES,  MURPHY and CHRISTIAN's actions were intentional, and motivated by bad faith and deliberately indifferent to Plaintiffs' rights.

113.    Further it was because of Defendant CITY's history and policy and practice of inadequate investigations, that Defendants were emboldened and violated Plaintiffs' rights with impunity.

114.    As a result of the foregoing, Plaintiffs sustained, *inter alia*, deprivation of their constitutional rights, emotional injuries, loss of income, pain and suffering; severe mental anguish, emotional distress, fear and lack of privacy.

**<u>FIRST CLAIM FOR RELIEF</u>**
**<u>FAILURE TO INTERVENE IN VIOLATION OF 42 U.S.C.§ 1983</u>**

115.    The Plaintiffs incorporate by reference the allegations set forth in all previous Paragraphs as if fully set forth herein.

116.    Each and every individual defendant had an affirmative duty to intervene on Plaintiffs' behalf to prevent the violation of their constitutional rights.

117.    Defendant CHRISTIAN, knowing that GRAVES and MURPHY had lied by submitting fraudulent DD-5's to cover up their illegal entry into Plaintiffs' home, failed to intervene, and in fact performed a subpar investigation in order to aid in the cover up of GRAVES and MURPHY's illegal actions.

118.    Defendant CHRISTIAN failed to intervene on Plaintiffs' behalf to prevent the violation of their constitutional rights incurred by the conspiracy against them, despite having had a realistic opportunity to do so.

119.    Defendant CHRISTIAN implicitly authorized approved and knowingly acquiesced in the unconstitutional conduct of subordinate GRAVES and MURPHY's conduct when she helped them cover up their unconstitutional actions.

120.     As a result of the aforementioned conduct of the individual Defendants,

Plaintiffs' constitutional rights were violated.

## SECOND CLAIM FOR RELIEF
### SUPERVISORY LIABILITY FOR DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983

121.     The Plaintiffs incorporate by reference the allegations set forth in all previous

Paragraphs as if fully set forth herein.

122.     By their conduct in failing to remedy the wrongs committed by employees of

the CITY OF NEW YORK under their supervision; in failing to properly train, supervise, or

discipline employees of the CITY OF NEW YORK under their supervision; and in directing

employees under their supervision, Defendant CHRISTIAN, acting under the color of state

law and in their individual and official capacities and within the scope of their employment,

caused damage and injury in violation of Plaintiffs' rights guaranteed under 42 U.S.C. § 1983,

and the United States Constitution, including its Fourth Amendment.

123.     Defendant CHRISTIAN acted in a reckless and deliberate indifferent manner and

fashion, and with gross negligence, in order to achieve, also, in addition to statements above

incorporated by reference, the collateral purpose of closing out an unsubstantiated case

simply for, in additional to reasons stated above, for the purpose of achieving a statistical

closeout as "unsubstantiated" but without the requisite objectively reasonable trustworthy

evidence to justify the conclusion.

124.     Defendant CHRISTIAN engaged in a reckless and deliberately indifferent

investigation of her own convenience and in order to achieve their own end rather than to

achieve the legitimate law enforcement mission of solving an alleged crime/violation or to

determine whether a crime/violation even took place, and at least implicitly authorized

approved and knowingly acquiesced in the unconstitutional conduct of subordinate GRAVES and MURPHY's conduct when she helped them cover up their unconstitutional actions.

125.     As a result of the foregoing, Plaintiffs were deprived of their liberty, suffered specific and serious bodily injury, pain and suffering, emotional distress and psychological injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

## THIRD CLAIM FOR RELIEF
## CONSPIRACY AND FIRST AMENDMENT RETALIATION UNDER THE UNITED STATES CONSTITUTION AND 42 U.S.C. 1983

126.     The Plaintiffs incorporate by reference the allegations set forth in all previous Paragraphs as if fully set forth herein.

127.     Plaintiffs P. Jenny Marashi and Seth Curkin are lawyers whose professions involve making good faith statements/filings about the conduct of police officers which police officers may disagree, or not want to be held accountable.

128.     Defendants MURPHY and GRAVES conspiring together, and/or with Defendant CHRISTIAN, purposefully and with the intention of covering up their misdeeds of gaining access to the home of Plaintiffs with a warrant for T****s H****r, had a meeting of the minds, and agreement where they lied, misrepresented statements made by Plaintiffs, and filed NYPD approved documents, knowing that such statements were false and for the purpose of covering up their actions on August 18, 2015.

129.     Defendant CHRISTIAN, GRAVES and MURPHY's actions alone together were motivated by an agreement to deprive Plaintiffs of their constitutional rights to work, and to speak and/or write about the actions of officers who have violated the constitution and deprived Plaintiff's clients of their constitutional rights, amongst other things, including their right to access courts.

130.     Defendants CHRISTIAN, GRAVES and MURPHY, in conspiracy with one another, or acting alone under the color of state law and in their individual and official capacities and within the scope of their employment, caused damage and injury in violation of Plaintiffs' rights guaranteed under 42 U.S.C. § 1983, and the United States Constitution, including its First Amendment.

131.     Defendants GRAVES and MURPHY entered Plaintiffs' building of residence purposely, and maliciously using a three year old warrant for another person, a T*****s H*****r, who also lived on the 8th floor.   Detectives used this warrant in order to escape detection from the doorman, and make their way upstairs.  Once upstairs, Detectives Graves and Murphy, who had come to threaten and harass civil rights attorney P. Jenny Marashi and/or criminal defense attorney Seth Curkin, for some malicious purpose against the bounds of human decency.

132.     Detectives Graves, Murphy, and CHRISTIAN then fabricated evidence, hiding any mention of that warrant for T*****s H****r, and making up a novel reason, as looking for an I-card suspect, "John Walden" for coming to the home/office of Plaintiffs.

133.     Defendants GRAVES and MURPHY acted with intent to do harm to Plaintiffs without excuse or justification, and in a manner that shocks the conscious.

134.     By the conduct and actions described above, defendants while engaged in under the color of state law, conspired to interfere with and violate rights secured to plaintiff by the Constitution of the United States in violation of 42 U.S.C. § 1983, including, but not limited to, plaintiff's First, Fourth and Fourteenth Amendment rights.

135.     Defendants, through the actions alleged above, consciously disregarded known and excessive risks to plaintiff's liberty and welfare and engaged in a deliberate and unjustified effort to harass and intimidate plaintiff at all costs.

136.     This included a course of conduct and pattern of behavior whereby Defendants, inter alia, conspired and created and fabricated evidence to create the appearance of a justified entry into Plaintiffs home, intentionally and maliciously concealed material exculpatory evidence.

137.     Additionally, the extreme indignities, humiliation, and fear that Plaintiffs were forced to endure worried that NYPD Detectives would come again, that they could harm their young children, wondering what would have happened if they had been home, or what would have happened if Parastou Marashi were not home, not being able to uncover the purpose of the visit, both individually and collectively state a violation of plaintiff's rights.

138.     That such conduct by defendants deprived plaintiff of liberty, property, and dignity and constituted a substantive due process violation under the Constitution.

139.     Defendants' conduct precipitated and caused the sequence of events that ultimately resulted in the deprivation of Plaintiffs' liberty, property, and dignity.

140.     Defendants' conduct in this regard was so egregious and outrageous as to shock the conscience.

141.     As a direct and proximate result of the foregoing, Plaintiffs were placed in substantial and prolonged fear for their safety, without probable cause or other lawful justification, in violation of the Constitution of the United States and suffered and will continue to suffer injury and damages as a result, including, inter alia, physical and mental pain and suffering, and mental anguish.

142.     As a result of the foregoing, Plaintiffs were deprived of their liberty, suffered specific and serious bodily injury, pain and suffering, emotional distress and psychological injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

## FOURTH CLAIM FOR RELIEF
## MUNICIPAL LIABILITY "MONELL" CLAIM UNDER 42 U.S.C. § 1983)

143.     Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth at length herein.

144.     The individual defendants, singly and collectively, while acting within the scope of their employment and authority and under color of state law, engaged in conduct that constituted customs, policies, practices, procedures, rules, or usages of the NYPD and their specific precinct(s) and/or forbidden by the Constitution of the United States.

145.     The foregoing customs, policies, practices, procedures, rules, and usages include, but are not limited to,

146.     City Defendant has long had constructive knowledge of this problematic custom and practice of subpar IAB investigations, and failed to act in a way that would prevent further violations of constitutional rights.

147.     CITY is liable for these underlying constitutional violations committed by GRAVES,  MURPHY, and CHRISTIAN because the city's policy is objectively deliberately indifferent to the likelihood that a constitutional violation would occur.

148.     A pattern of constitutional violations regarding inadequate IAB investigations has become apparent, and no discernible training, supervision, or discipline has been put in place to fix this problem, thus making CITY liable.

149.     The abuse to which plaintiff was subjected was consistent with an institutionalized practice of the NYPD and/or IAB, which was known to and ratified by defendant CITY.

150.     Despite knowledge of these institutionalized practices, defendant CITY has at no time taken any effective action to prevent NYPD and/or IAB personnel from continuing to engage in this type of misconduct.

151.     Defendant CITY had prior notice of the vicious propensities of its officers, but took no steps to train them, correct their abuse of authority, or to discourage their unlawful use of authority.

152.     The failure of defendant CITY to properly train defendants included the failure to instruct them in applicable provisions of the State Penal Law of the State of New York, federal and state constitutional limitations, and the proper and prudent use of entry into homes.

153.     Defendant CITY authorized, tolerated as institutionalized practices, and ratified the misconduct detailed above by, among other things:

154.     Failing to properly discipline, train, restrict, and control employees, including defendants, known to be irresponsible in their dealings with citizens of the community;

155.     Failing to take adequate precautions in the training, hiring, promotion, and retention of police personnel, including specifically defendants herein;

156.     Failing to forward to the offices of the District Attorneys evidence of criminal acts committed by police personnel;

157.     Failing to establish or assure the functioning of a bona fide and meaningful departmental system for dealing with complaints of police misconduct, but instead

responding to these types of complaints with bureaucratic power and official denials calculated to mislead the public.

158.     That the failure to supervise and/or train by defendant CITY of defendants herein rose to the level of deliberate indifference to the consequences of its actions, and indifference to plaintiff's rights, privileges and immunities secured by the Constitution of the United States of America, inter alia, plaintiff's Fourth and Fourteenth Amendment rights.

159.     The NYPD and IAB have inadequately screened, hired, retained, trained, and supervised its employees, including the individual defendants herein, to respect the constitutional rights of those individuals with whom NYPD police officers come in contact.

160.     The foregoing customs, policies, practices, procedures, rules, and usages constituted deliberate indifference to plaintiff's safety, well-being, and constitutional rights.

161.     The foregoing customs, policies, practices, procedures, rules, or usages were the direct and proximate cause of the constitutional violations suffered by Plaintiffs.

162.     The foregoing customs, policies, practices, procedures, rules, or usages were the moving force behind the constitutional violations suffered by Plaintiffs.


## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demands the following relief jointly and severally against all the Defendants:

  a.  Compensatory damages in an amount to be determined at trial;

  b.  Punitive damages in an amount to be determined at trial;

  c.  Attorney's fees pursuant to 42 U.S.C. § 1988;

  d.  An award of Plaintiffs' costs of suit;

e.   Pre-judgment and post-judgment interest;

f.   Such other relief as this Court deems just and proper.

Dated this 22nd day of December 2020.

Respectfully Submitted,

_____/s/_____
P. Jenny Marashi (PM0916)
Marashi Legal
930 Grand Concourse, #1E
Bronx, NY 10451
(917) 703-1742
*Attorney for Plaintiffs*